**Ned G. SAALFRANK, Plaintiff,**

v.

**Melva M. O'DANIEL, Defendant,**

v.

**FORD MOTOR COMPANY et al., Third-Party Defendants.**

No. C 71–60.

United States District Court, N. D. Ohio, W. D.

Sept. 27, 1974.

On Motion to Reconsider Jan. 27, 1975.

Warren W. Wyneken, Fort Wayne, Ind., Matt Kolb, Toledo, Ohio, for plaintiff.

Wilbur C. Jacobs, John A. Pietrykowski, Finn, Manahan & Pietrykowski, Richard E. Antonini, M. Donald Carmin, Eastman, Stichter, Smith & Bergman, John M. Curphey, Toledo, Ohio, for defendant.

## MEMORANDUM and ORDER

WALINSKI, District Judge.

This cause is before the Court once again on plaintiff's motion to amend his complaint so as to assert, pursuant to Rule 14(a), Federal Rules of Civil Procedure, a claim directly against the third-party defendant Parkview Memorial Hospital [hereinafter Parkview]. This time he asks the Court to reconsider its rulings of October 6, 1972, and June 26, 1974, in which the Court denied plaintiff the opportunity to assert such a claim because of the lack of diversity of citizenship between plaintiff and Parkview. In the June 26th order, this Court said that since " * * * [n]othing [had] been *cited* to convince the Court that [its] earlier reasoning was invalid * * * ", the Court would deny the motion. However, at that time the Court did not fully review all of the earlier briefs on the question and the authorities cited therein because plaintiff did not appear to state any good reason in its motion why the Court should reconsider the issue. But plaintiff persists in advocating the view that this Court has wrongly decided the matter, and once more he asks for reconsideration. His persistence has therefore made this an issue that will not go away. The Court is thus moved to re-read the briefs, consult again the authorities, and to study anew the literature in the field.

Before discussing the issues raised by the motion, it is necessary to indicate the current procedural setting. The complaint was filed in February, 1971. Defendant O'Daniel filed a third-party complaint against Parkview in January, 1972. Also named as third-party defendants were the Ford Motor Company and Don Kremer Ford Sales. In March 1972, plaintiff was permitted to amend his complaint to assert a claim directly against Parkview. However, after extensive briefing, the Court granted Parkview's motion to dismiss in October, 1972. The parties then engaged in discovery and other pretrial procedures. Jury trial was waived, and the case was tried to the Court beginning May 28, 1974, and ending after six days of testimony on June 3, 1974. At the close of the trial, the Court entered an order in which all parties were requested to submit suggested findings of fact and conclusions of law. The order further indicated that, based on the evidence, the claims against Ford Motor Company and Don Kremer Ford Sales would be dismissed; that a verdict for plaintiff will be entered against defendant O'Daniel with damages being under advisement; and that the third-party complaint of O'Daniel against Parkview was taken under advisement. These briefs are now before the Court, and a decision on the entire case will soon be forthcoming.

Plaintiff is, for the purposes of this case, an Indiana resident. He claims

that while traveling from his parents' home in Indiana to his job in Toledo, his car was struck by defendant O'Daniel's car at the intersection of U. S. Highway 24 and State Road 6 near Napoleon, Ohio. At the time of the accident plaintiff's car was being operated by Patricia Creighton and he was a passenger in the front seat. Sometime after the collision, plaintiff was taken to the Parkview Memorial Hospital in Fort Wayne, Indiana, where, shortly thereafter, he fell from his hospital bed, thereby further aggravating his already serious injuries. It is said that the fall was proximately caused by the hospital's negligence in failing to provide any restraints for plaintiff and in failing to supervise him adequately.

Parkview has taken the position all along that a direct claim by a plaintiff against a third-party defendant under Rule 14(a) requires new independent grounds for jurisdiction, especially where, as here, the principal jurisdiction granting claim is based on diversity of citizenship. Indeed, since the great majority of cases which have decided the issue have adopted that view, this Court decided the issue in favor of Parkview after consulting the authorities cited. Given the weight of these authorities, especially McPherson v. Hoffman, 275 F.2d 466 (6th Cir. 1960), the Court did not feel constrained to make a study of the literature in the subject area.

In *McPherson*, the district court entered a judgment in favor of plaintiff against a third-party defendant who was a co-citizen of the plaintiff. The principal claim was based on the FELA. In reversing the decision, the Sixth Circuit said:

> "[u]nder the [FELA] the plaintiff could bring his action against the Railroad in Federal Court without diversity of citizenship [45 U.S.C., § 56]. He could not have sued the McPhersons in Federal Court separately, nor could he have joined them with Chesapeake and Ohio because there was no diversity between them and the McPhersons. [28 U.S.C., § 1332]. What he could not do directly could not be

done indirectly. The court did not have jurisdiction to enter a judgment against third-parties defendant in favor of plaintiff Hoffman. Jurisdiction cannot be waived." *Id.* at 470.

Parkview thus argues that the Court has no discretion in the matter because the issue is one of jurisdiction and not of discretion. Moreover, the argument is made in at least two of the cases cited by Parkview, McPherson v. Hoffman, *supra;* and Hoskie v. Prudential Ins. Co., 39 F.Supp. 305 (E.D.N.Y.1941), that since this kind of situation presents manifest opportunity for collusion, the courts should require new and independent jurisdictional grounds for Rule 14 claims by plaintiffs against third-parties defendant. Parkview also argues that plaintiff's case against it in the state courts of Indiana is now ready for the second trial, the first having ended in a hung jury, and thus plaintiff cannot be prejudiced by dismissal of his third-party claim. Finally, Parkview argues that the matter of any inconvenience to plaintiff in trying the same facts in two or more different proceedings is not a proper consideration for this Court, and is not a good reason to extend the established boundaries of federal court jurisdiction.

Plaintiff argues that most of the cases on which Parkview relies are somewhat dated and that the modern trend is not to dismiss merely because the plaintiff and third-party defendant share a common residence. In support of this, *inter alia,* he cites Buresch v. American LaFrance, 290 F.Supp. 265 (W.D.Pa. 1968); and Olson v. United States, 38 F.R.D. 489 (D.Neb.1965), both of which were the mirror of the procedural arrangement here. To these cases, the Court would also add Davis v. United States, 350 F.Supp. 206 (E.D.Mich. 1972). The theory underlying plaintiff's position is grounded in ancillary jurisdiction, his position being that the claim he seeks to assert is within the ancillary jurisdiction of the Court. *See, e. g.,* Sklar v. Hayes, 1 F.R.D. 594, 596 (E.D. Pa.1941).

The mere passage of time, however, does not make a rule suspect; indeed it may only serve to illustrate its felicity. Yet a rule of law may be undermined by subsequent developments over a period of time. A new rule in a related area may be established, and it may take time for the courts to decide its effect on issues which stand at the edge of its parameters. And so it is the case here.

The Supreme Court decision in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), significantly affected judicial thinking about federal court subject matter jurisdiction. In *Gibbs* the Court held that a federal court has the power to consider a claim bottomed purely in state law which it ordinarily would not hear because of lack of diversity if the state claim grew out of the same operative facts as the jurisdiction giving federal claim. The basic premise of *Gibbs* is that the power to consider cases and controversies which is granted by Article III of the Constitution is the power to consider the *entire* case, including *all* of the claims which arise from a "common nucleus of operative fact." The Court also said in a footnote that:

> "While it is commonplace that the Federal Rules of Civil Procedure do not expand the jurisdiction of federal courts, they do embody 'the whole tendency of our decisions * * * to *require* a plaintiff to try his * * * whole case at one time'." *Id.* at 725, n. 13, 86 S.Ct. at 1138. [*Emphasis added.*]

This premise again appeared in State Farm Fire and Cas. Co. v. Tashire, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967), where the Court said:

> "Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, so long as any two adverse parties are not co-citizens." *Id.* at 531, 87 S.Ct. at 1204.

Since *Gibbs* was decided, the lower federal courts have been more sensitive to the existence of power to consider an entire case while also holding, as did *Gibbs*, that the decision to exercise the power is a matter of discretion for the trial judge. In F. C. Stiles Cont. Co. v. Home Ins. Co., 431 F.2d 917 (6th Cir. 1970), the plaintiff sued three insurers for losses incurred in a fire, and jurisdiction was based on diversity. Two of the defendants, however, were liable only for less than the $10,000 amount in controversy requirement. The Sixth Circuit, in affirming the trial judge's consideration of the two claims, found the *Gibbs* rationale to be applicable, saying:

> This would allow a plaintiff to adjudicate [sic] in a single forum a claim against a diverse defendant which does not meet the necessary jurisdictional amount if it is properly joined with a claim against another defendant which meets all the necessary jurisdictional requirements, provided that both claims are part of the same controversy. * * * [A]s the District Court pointed out, the possibility of multiple litigation and conflicting decisions runs contrary to the policy of judicial economy and fairness to litigants. Therefore the better procedure was to permit plaintiff in this case to adjudicate his entire lawsuit in one action in the federal court." *Id.* at 919–20.

*See also,* Beautytuft, Inc. v. Factory Ins. Assoc., 431 F.2d 1122 (6th Cir. 1970), where a similar rationale was used to reach a similar result.

In Hatridge v. Aetna Cas. & Sur. Co., 415 F.2d 809 (8th Cir. 1969), the case was in federal court by removal and jurisdiction was based on diversity. The question of pendent jurisdiction, the doctrine used in *Gibbs*, arose with respect to a wife's loss of consortium claim being pended to her husband's personal injury claim. The issue turned in part on Arkansas' rule that a consortium claim is derivative and does not stand independently since it is contingent on the success of the husband's action. In that case, the wife's claim was for less than $10,000. In an opinion written by the

then Judge Blackmun, the Court held that pendent jurisdiction was specifically applicable, saying:

> "Although *Gibbs* concerned claims possessed by a single plaintiff, the decision clearly indicates that 'there is *power* in federal courts to hear the whole.'" *Id.* at 816.

The Court specifically approved the practice of joining claims and parties in one proceeding where the claims derive from one set of facts, saying:

> "It makes good sense; it avoids forum shopping and multiple actions; it tends to reduce costs for litigants; and it avoids the waste of already heavily burdened judicial time. We feel that a consortium suit, in the light of its stated character under Arkansas law, is ideal for the application of the doctrine. We apply pendent jurisdiction as a supportive ground for our conclusion here." *Id.* at 817.[1]

The Third Circuit held in Jacobson v. Atlantic City Hosp., 392 F.2d 149 (3rd Cir. 1968), that *Gibbs* is not distinguishable because it and Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), involved a federal question on the primary jurisdiction granting claim. The Court discussed the policies underlying *Gibbs* and said:

> "These considerations seem as applicable to cases in which federal jurisdiction is based upon diversity of citizenship as to federal question cases." *Id.* 392 F.2d at 155.

*See also,* Stone v. Stone, 405 F.2d 94 (4th Cir. 1968), where the Court said:

> "Thus, in multi-claim *diversity* cases, the Third Circuit treads the path recently blazed by the Supreme Court in [*Gibbs*], where guidelines were announced for the proper handling of state claims in *federal question* cases.
>
> "In the latter type of case, the question is to what extent, under the doc-

trine of pendent jurisdiction, a federal court may adjudicate a claim grounded in state law when jurisdiction is based on the presence of a federal question. We recognize, of course, that the question before us—whether a federal court may exercise jurisdiction in a diversity case over a claim which in itself does not exceed $10,000—is not precisely the same as the question raised under the pendent jurisdiction doctrine—whether a federal court may take jurisdiction in a federal question case over a claim based on state, not federal, law. An apt analogy between the two is, however, at once apparent. In each situation, the federal court has before it a claim which clearly satisfies the requirements of § 1331 or § 1332, and in each instance the plaintiff asserts an additional claim which, if litigated alone, would not satisfy a jurisdictional requirement. Otherwise stated, the question in both the federal question area and the diversity area is whether a federal court may exercise jurisdiction over a claim which, standing alone, would not meet the jurisdictional test.

> "We find the force of the analogy most compelling and therefore adopt the approach enunciated by the Supreme Court in *Gibbs. Id.* at 97.

The Second Circuit used *Gibbs* to permit a plaintiff to pend an unfair competition claim to a copyright infringement claim; and in so doing, the Court noted that cases decided before *Gibbs* which denied jurisdiction, in the sense of judicial power, over a pendent claim are suspect as authority. *See* Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627, 629 (2nd Cir. 1971). *See also,* Leather's Best, Inc. v. S. S. Mormaclynx, et al., 451 F.2d 800 (2nd Cir. 1971).

In Davis v. United States, 350 F.Supp. 206 (E.D.Mich.1972), plaintiff brought

---

1. To the contention that these cases are distinguishable because the defect was in the amount in controversy requirement and not in diversity, it may be noted that most federal question cases also require the same amount in controversy for jurisdiction. *See* 28 U.S.C. § 1331.

3

a claim under the Federal Tort Claims Act against the government alleging negligence in failing to supervise properly the preflight procedures of the pilot. The government filed third-party claims against the aircraft owner and pilot alleging that they were responsible for the crash which took the life of plaintiff's decedent. Plaintiff then sought to amend her complaint to assert a claim directly against the owner and pilot alleging negligence. There was no diversity of citizenship as between the plaintiff and the third-party defendant. Thus, the situation was very similar to the case at bar. Judge Joiner decided to permit the claim and based his decision squarely on *Gibbs*. He said:

"To read *Gibbs* to apply only to situations wherein there is one plaintiff and one defendant having two claims between them (a Federal claim and a State claim) is to destroy the spirit of the case. The intent of the court was to permit Federal courts to hear controversies within the limits of a 'nucleus of operative fact', yet the fact situation of *Gibbs* is entirely too narrow to give full effect to that policy. As long as there is only one wrong and one recovery, as here, and, as here, all parties are properly before the court, whether as plaintiff, defendant or third party defendant, it matters not how many defendants there are, nor does it matter that one of the claims between two of the parties is not supported by independent jurisdictional grounds." *Id.* at 208.

It can be seen that the situation in *Davis* is the precise situation as this Court faces now with the single exception being a federal question as the primary claim there and diversity here. But as has already been seen in Stone v. Stone, *supra,* that distinction is not controlling.

In addition to these cases,[2] many of the writers in this area argue that the better view is to follow the *Gibbs* rationale. One writer says that *Gibbs:*

" * * * can authorize an independent relaxation of the rule against ancillary jurisdiction over plaintiff's amended claims against the third-party defendant. At the outset, the question must be redefined. It should not be a question of pure law posing the choice 'either there is ancillary jurisdiction, and the court must take it, or there is no ancillary jurisdiction, and the court cannot take it.' Instead, since there is jurisdictional power to hear the whole case, the question is one of trial court discretion whether to exercise that jurisdiction, considering all the factors of economy and convenience in the context of federalism. Once this basic redefinition takes place, the traditional reasons given for supporting a rule of flat prohibition do not necessarily disappear. Instead they become factors for the trial court to consider in exercising its discretion." 3 Moore's Federal Practice, ¶ 14.27[1], at 14–570.

The writer further argues there is no reason why a plaintiff ought not to be able to do indirectly what he couldn't do otherwise because plaintiff took his chance by suing defendant alone who in turn brought the third-party defendant into the case. Since it was an act of another which brought in the non-diverse party, judicial economy and convenience may dictate that the entire case be decided by allowing all the claims to be asserted which derive from the same transactions and occurrences. *Id.* at 14–571.

The mere possibility of collusion is also said to be insufficient grounds for barring all claims *ab initio.* *See* Note, "Rule 14 Claims and Ancillary Jurisdiction," 57 Ya.L.Rev. 265, 275 (1971), where the writer states that:

"[A] 'knee jerk' denial of ancillary jurisdiction in all cases merely because of the fear of collusion is an inadequate response to the central jurisdictional question. * * * To deny ancillary jurisdiction in all situations

---

2. *See also,* Stamm v. Trigg, 368 F.Supp. 83 (N.D.W.D.Ohio 1973), a previous decision by this Court involving pendent jurisdiction.

merely because collusion may be present in a few cases is too severe a prophylactic device, especially in light of [28 U.S.C., § 1359]." [3]

The same position is also taken in 6 Wright & Miller, Federal Practice and Procedure, § 1444, at pp. 231–2.

Even pre-*Gibbs* writers urged that the courts had jurisdiction under the rationale of Moore v. N. Y. Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). No less than Judge Holtzoff urged this view in an address to the Judicial Conference of the Sixth Circuit, reprinted at 31 F.R.D. 101 (1962), where he said:

> "It would seem, perhaps, that a separate basis for jurisdiction and venue should not be needed to justify the assertion of the plaintiff's claim as against a third-party defendant. The prevailing view is, however, to the contrary. This attitude from a practical standpoint, may lead to failure of justice in some cases. Some of the beneficent aspects of third-party practice may be frustrated. As a matter of theory and logic, it would seem reasonable to hold that a third-party claim is ancillary and auxiliary to the main suit for all purposes, and not only as between the third-party plaintiff and the third-party defendant."

Another writer asserted that a denial of judicial power exalts form over substance and said:

> "Once a third-party defendant is brought into an action the court should be able to settle all claims arising out of the transaction that is the basis of the action, and it should be immaterial which party asserts the claim because the desirability of avoiding piecemeal litigation of disputes is as great whether the claim is asserted by a defendant or by a plaintiff. The parties and the facts are already before the court so that the burden on the court will not be increased by holding that the plaintiff's claim against the third-

party defendant is ancillary." Fraser, Ancillary Jurisdiction and the Joinder of Claims in the Federal Courts, 33 F.R.D. 27 (1963).

Finally, Professor Baker argues that:

> "Rather than stumble over jurisdictional obstacles in the situation, it would be preferable to recognize the trial judge's *power* (in the sense of jurisdiction) to hear all the claims and counterclaims, but permit *discretion* to dismiss the nonfederal claims without prejudice in the event he determines that their joinder in a single case will unduly complicate or prejudice the trial of the federal claim." Baker, "Toward a Relaxed View of Federal Ancillary and Pendent Jurisdiction," 33 U.Pitt.L.Rev. 759, 776 (1972).

This Court finds these arguments persuasive and has concluded that it must retreat from its former view. *Gibbs* and the succeeding decisions by various Circuit Courts of Appeal, especially the Sixth Circuit, make clear that this Court's power to hear and decide a case properly before it extends to all of the claims which grow out of the transactions or occurrences that gave birth to the lawsuit. It is further clear that the *Gibbs* case teaches that the question now becomes whether it is appropriate to exercise jurisdiction in this case. The Court has concluded that it is.

There is no more compelling case for the exercise of pendent jurisdiction than this one. If its exercise were finally denied, it is inescapable that there is no single courthouse in which this plaintiff could bring all of his claims which grew out of the accident and subsequent fall. He will, as indeed he already has been, be forced to travel repeatedly back and forth between federal and state courts, shuffling witnesses and exhibits to and fro, incurring expenses solely attributable to duplicated effort and at each end being forced to serve up only half a loaf to the court. It seems clear to this

---

3. In this regard *see* Farr v. Detroit Trust Co., 116 F.2d 807 (6th Cir. 1941), where the Sixth Circuit held that a court must look to real facts in deciding jurisdictional questions.

Court that this is the very kind of case to which the *Gibbs* reasoning was directed.

Moreover, it is clear that all the claims derive from a common nucleus of operative fact, and not as Parkview contends from two separate sets of facts. Plaintiff's claims are clearly of the kind which one would expect to be tried in one proceeding. Therefore, since the justification for the exercise of pendent jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants," this case presents an ideal occasion for the application of *Gibbs*.

■ It should be noted that there is not the merest glimmer of any collusion among any of the parties. Were it otherwise the Court would not hesitate to dismiss plaintiff's motion. The pleadings and the trial of this case all show that the third parties were brought into the case on the basis of good faith claims supported by legal rights to relief which appeared well taken.

As for the propriety of granting plaintiff's motion after trial but before judgment, it is beyond dispute that Rule 54 (b) contemplates that a district judge may correct or revise decisions or orders issued before final judgment. There will be time enough later to decide whether Parkview has been prejudiced by this decision. It should be noted however that plaintiff's amended complaint asserting a claim directly against Parkview was initially filed on March 21, 1972, more than two years ago.

For the foregoing reasons, it is

Ordered that the orders of this Court of October 6, 1972, and June 26, 1974, be vacated, set aside, and held for naught. Plaintiff's claim directly against the third-party defendant Parkview Memorial Hospital stands as filed.

## MEMORANDUM and ORDER
## ON MOTION TO RECONSIDER
WALINSKI, District Judge.

This cause is before the Court on the motion of third-party defendant Park-view Memorial Hospital [hereinafter Parkview] to reconsider this Court's Memorandum and Order of September 27, 1974, in which the Court permitted plaintiff herein to assert a claim directly against Parkview even though there is no diversity of citizenship between plaintiff and Parkview. In a reply brief filed December 9, 1974, Parkview raises for the first time a charge that collusion exists between plaintiff and defendant O'Daniel "to assist plaintiff in recovering against Parkview and in turn recovering some of the insurer's payment." This Court has previously indicated its readiness to take appropriate action in the event collusion were shown to exist.

Section 1359, Title 28 U.S.Code, provides that:

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

Parkview charges that plaintiff's counsel wrote defendant O'Daniel's counsel on November 11, 1971, and November 18, 1971, and solicited him to file a third-party complaint against Parkview. At the same time plaintiff's counsel also prepared the appropriate motion papers, third-party complaint, summons and other papers and provided them for O'Daniel's counsel's use. It is these facts which Parkview contends constitute collusion.

In Kramer v. Caribbean Mills, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), the Supreme Court noted that its decisions under § 1359's predecessor statute, 28 U.S.C., § 80 (1940 ed.), have continuing validity in interpreting § 1359. In one of these decisions, In re Metropolitan Ry. Receivership, 208 U.S. 90, 28 S.Ct. 219, 52 L.Ed. 403 (1908), the Court noted:

"* * * there is not the slightest evidence of any fraud practiced for the purpose of thereby creating a case to give jurisdiction to the Federal court. That the parties preferred to take the

subject matter of the litigation into the Federal courts, instead of proceeding in one of the courts of the state, is not wrongful. So long as no improper act was done by which the jurisdiction of the Federal court attached, the motive for bringing the suit there is unimportant." *Id.* at 111, 28 S.Ct. at 225.

And, in Wheeler v. Denver, 229 U.S. 342, 351, 33 S.Ct. 842, 845, 57 L.Ed. 1219 (1913), the Court stated that:

"* * * mere unity of interest or difference in its degrees is not enough, there must be an illegal purpose. If the interest was real and the peril which threatened was real or thought to be real, unity of interest or contribution of expenses cannot be regarded as necessarily proof of collusion. * * And the cases are numerous in which it has been decided that the motives of litigants in seeking Federal jurisdiction are immaterial."

■ Under these decisions it is apparent that mutuality of interest in asserting a claim against another party and the motives for choosing the federal forum are simply not any basis for finding that collusion exists.

Other lower court decisions are also instructive. Allstate Ins. Co. v. Lumbermens Mut. Cas. Co., 204 F.Supp. 83 (D. Conn.1962) was an action by an employer and its insurer against the insurer of one of its employees and the persons he had injured in an automobile accident. The employer had already been sued by the injured parties in a suit in the state court. The plaintiffs sought a declaratory judgment as to the employer's rights to the benefits of the employee's own personal liability policy. Both of the insurance companies, however, were Illinois citizens; thus there was no diversity. The court ordered the employer's insurance company dismissed. Then the employee's insurance company charged collusion in that the employer's insurance company had solicited the employer to bring suit and had agreed to indemnify it against the costs and

fees of the suit. But the court rejected these arguments holding that there was no collusion since both plaintiffs had their own interest to assert and the employer was no mere dummy in the suit and had not surrendered control of the litigation. Moreover, the court pointed out, there was no illegal purpose. *See also*, First Cong. Church v. Evangelical & Ref. Church, 160 F.Supp. 651 (S.D.N.Y.1958), which also held that the mere fact that others aid a party in bringing a suit is unimportant.

■ Thus, under these decisions, collusion will not be found where a party with a bona fide legal interest to assert solicits another party with a similar bona fide legal interest to assert to bring suit and aids in so doing. *See also*, Matthies v. Seymour Mfg. Co., 23 F.R.D. 64 (D.Conn.1958) where, in addition to inducing and soliciting the plaintiff to bring the suit, the co-citizen of the defendant underwrote the costs and all expenses attendant thereto and plaintiff would not have brought the suit without such solicitation and inducement.

These principles are not of recent origin. This Court long ago recognized in Benedict v. Seiberling, 17 F.2d 841 (N.D.W.D.Ohio 1927), substantially similar rules. Additionally, this Court held that:

"Collusion in the sense of fraud does not necessarily exist even if the plaintiff's justiciable interest was manipulated into existence and action thereon incited by a defendant or parties interested in plaintiff's success, provided the right to sue actually existed at the time of suit. [Citations omitted.] Nor even if action was arranged by parties between whom a justiciable controversy existed." *Id.* at 853.

While more recent decisions by other courts and statutory changes may cast doubt on the continuing validity of a holding which sanctions federal court jurisdiction over a claim which was "manipulated into existence," there can be no doubt that Benedict v. Seiberling

still stands as good law in many important respects. Not the least of these is the recognition that two parties between whom a controversy exists may properly join in an effort to have a third party joined where both have a good faith claim to assert against the third party.

■ In light of these decisions, this Court has made a re-examination of the file of this lawsuit, as well as the evidence adduced at trial, which might bear on the issue now before it. This review convinces the Court beyond peradventure of doubt that there is not even "the merest glimmer" of collusion. What the Court did find was good faith, legally supportable reasons for both Saalfrank and O'Daniel for O'Daniel to implead Parkview, accompanied by well-conceived litigation strategy. This is evident from the following evidence introduced at trial.

On November 18, 1971, plaintiff's counsel wrote O'Daniel's counsel (who also represented her insurance carrier) to urge Parkview's impleader. It should be noted that this correspondence took place against a background of settlement negotiations. The insurance carrier was offering its policy limits in compromise, and the plaintiff suggested in return that defendant implead Parkview. Thus, in urging that a third-party complaint be filed, counsel said:

"* * * I believe that my recommended strategy is correct and that you have a great deal to gain and nothing to lose by making the hospital your defendant on the theory that you are entitled to indemnification in full or in part for any damages as may be assessed against Mrs. O'Daniel.

"I should not deny that our purpose in proposing this action has the ulterior motive of making it possible to also make the hospital the defendant of Mr. Saalfrank in the same proceedings. In such an effort, it is likely that we would also join the Ford Motor Company. We believe that we are justly entitled to have all parties in one form [sic] and that ultimate justice will be served if the various causes are so consolidated."

Here there is no indication of a corrupt purpose to manufacture federal court jurisdiction where none existed. Rather there is a good faith belief shown that the third-party procedure was proper.

Defense counsel immediately advised the insurance company of receipt of this letter. In so doing, he states:

"You will notice that in his Motion, Mr. Wyneken discloses to the judge the fact of settlement and you will note from his letter and the structure of the documents that he is not insisting that the motion be granted before we enter into our settlement. I have not made any oral or moral commitment to him that our settlement is contingent on favorable action by the court. I am concerned about this because there are many practical as well as legal reasons why the judge might overrule the motion. The motion is discretionary and if it is overruled there is little that could be done and Mr. Wyneken would have to revert to a request by our insured to intervene in the Indiana case. The judge may sense that he is simply substituting a defendant more likely to go to trial on the issues so that settlement does nothing to improve his docket. Some one also might raise technicalities about diversity which does not exist between plaintiff and the hospital. Diversity is not required in all third-party situations but this is likely to influence the judge if there is a strong objection. The annotation in 8 A.L.R.3d 639 is quite helpful and authorizes this procedure, but the leading cases are from New York and California. Much would depend on whether the judge would like to be a pioneer in procedural matters."

Here again the tone and contents of the letter clearly indicate no improper motives or acts.

The same attorney again wrote the insurer on December 3, 1971, asking the

company specifically to authorize the filing of the third-party complaint. In it he says:

> "I doubt that such diligence would ever be required of us, but it could be argued that part of our defense of the insured might include the filing of a similar motion. In other words I would recommend approving our filing of the motion even if the settlement proposition falls through as it cannot do us any harm and might do the insured some good in the ultimate disposition of the case."

Thus, counsel clearly felt it a proper strategy on behalf of O'Daniel. Later he states that the insurance company is under a duty to provide a defense for O'Daniel, and therefore, the litigation strategy he develops must protect O'Daniel's interest in protecting against a judgment in excess of the policy limits.[1] As he stated in his letter to the company on March 16, 1972:

> "I will try my best to pare the costs of defense to the absolute minimum however we are not in a position where we can simply turn the defense over to personal counsel for the insured. As you know the contract to provide a defense is completely separate from the contract to pay policy limits and the insured will need at least some minimum guidance from us until the entire action is finally disposed of."

Surely, since collusion by its very nature is suggestive of a corrupt purpose or motive, some evidence of such an attitude of impropriety would appear in the private correspondence of these attorneys. It is obvious that none exists here.

Finally, there is defendant O'Daniel's own sworn affidavit of December 13, 1971, in which she states that she has consulted her own attorney independent of the insurance company who recom-

mended that she accept the terms of the settlement and that she understands the procedure to be in her own best interest.

Based on all of the foregoing, this Court is drawn irresistably to the conclusion that no collusion exists whatever in the attempt to implead Parkview and that the acts complained of constitute nothing more than sound litigation strategy and enlightened assistance of counsel. Parenthetically, it should be added that it is the attorneys herein who wear the hats of pioneers.

One final matter exists regarding the motion to reconsider. Parkview argues that Rule 14, Federal Rules of Civil Procedure, provides only a procedural device for third-party practice and that in order to invoke impleader properly there must be a substantive right permitting indemnity or contribution. But, it is further argued, neither Ohio nor Indiana law permits contribution or indemnity among joint tortfeasors, and therefore, a third-party complaint against Parkview was not proper in the first instance. Since Parkview was not properly in the case, there could be no occasion for plaintiff to assert under the theory of pendent jurisdiction, a claim directly against Parkview.

Before resolving this issue, a word on choice of law is necessary. In its briefs on the matter, Parkview appears to suggest for the first time that the law of Ohio may not govern the decision on this issue and that Indiana law might be applicable instead. It should be readily apparent to all of the parties, however, that this Court has been applying Ohio law throughout this lawsuit, and Parkview does not plainly say why the law of Indiana should now be the rule of decision instead.

■ ■ Under the Rules of Decision Act, 28 U.S.C. § 1652, as interpreted

---

1. Numerous Ohio decisions have held that an insurer has a duty to defend a suit where the complaint brings the action within the policy regardless of the ultimate outcome or liability to the insurer. *See, e. g.,* State

Farm v. Pildner, 40 Ohio St.2d 101, 321 N.E.2d 600 (1974); Motorists Mutual v. Trainer, 33 Ohio St.2d 41, 294 N.E.2d 874 (1973); Lessak v. Metropolitan Cas. Ins. Co., 168 Ohio St. 153, 151 N.E.2d 730 (1958).

by the Supreme Court in Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this Court must apply whatever law an Ohio court would apply. Ohio has now abandoned the old *lex loci delicti* rule in tort cases and employs instead the more modern balancing of interests approach. Fox v. Morrison Motor Freight, 25 Ohio St.2d 193, 267 N.E.2d 405 (1971); Schlitz v. Meyer, 29 Ohio St.2d 169, 280 N.E.2d 925 (1972). The mere fact that the negligence, if any, of Parkview took place in Indiana is not controlling. Moats v. Metropolitan Bank, 40 Ohio St.2d 47, 319 N.E.2d 603 (1974).

■ Parkview does not say what interest Indiana has in having its law applied in this case. Since the law of Indiana is at best unclear and probably non-existent on the precise facts of this case, it is extremely difficult for this Court to speculate on the interests of Indiana.[2] Such is not the case with Ohio's interests however. The defendant seeking to implead Parkview is an Ohio citizen. Obviously Ohio has an interest in not having its citizens who are claimed to be tortfeasors subjected to proportionately higher damage verdicts because of the subsequent medical malpractice of one who supplies medical services to the victim. Moreover, where, as here, the original tort took place in Ohio through the negligent acts of an Ohio defendant, Ohio automobile liability insurance carriers can ascertain their underwriting risks and premiums best if their insured's rights to indemnification or contribution are governed by the law of Ohio rather than potentially diverse laws of several states. Hence, this Court must conclude that an Ohio court faced with the exact facts of this case would apply Ohio law.

■ As this Court pointed out in its Memorandum of October 15, 1971, and in its Order of May 20, 1974, Ohio courts recognize a distinction between primary and secondary liability as an exception to the rule barring contribution or indemnity among joint tortfeasors and permit one secondarily liable to seek indemnification. *See, e. g.,* Burns v. Pennsylvania Rubber & Supp. Co., 117 Ohio App. 12, 189 N.E.2d 645 (1961). However, as the Court then noted, there were no Ohio decisions squarely on point. Since that time, however, the Ohio Supreme Court has decided Travelers Indemnity Co. v. Trowbridge, 41 Ohio St.2d 11, 321 N.E. 2d 787 (1975). In that case the Ohio Supreme Court expressly recognized a right of indemnification in favor of an original tortfeasor from a treating physician whose independent negligence in treating the victim of the original tortfeasor further aggravates the victim's injuries. Substitute hospital for physician in that holding and one has the facts of this case. Since both a doctor and a hospital provide medical services to those in need, there is no reason to suppose that the Ohio Supreme Court would distinguish between them. Therefore, it is now beyond dispute that a substantive right of indemnification exists between an original tortfeasor and a subsequently negligent provider of medical services. Hence, Parkview was properly in this lawsuit as a third-party defendant, and plaintiff properly had occasion to assert a pendent claim directly against the hospital.

Parkview's motion to reconsider is thus denied. Plaintiff's motion to strike

---

2. Parkview's reliance on McClish v. Niagara Machine & Tool Works, 266 F.Supp. 987 (S.D. Ind.1967), is misplaced. There an injured employee sued the manufacturer of a machine for breach of warranty, and the defendant filed a third-party complaint against the employer alleging that the machine was negligently used or designed. In deciding to dismiss the third-party complaint on the grounds that Indiana law does not permit contribution in the absence of an express or implied contract, the court cited two Indiana decisions for authority: An 1868 Indiana Supreme Court case, Silvers v. Nerdlinger, 30 Ind. 53; and a 1943 Indiana Appellate case, City of Gary v. Bontrager Const. Co., 113 Ind.App. 151, 47 N.E.2d 182. Thus, at best *McClish* represents another federal court's conclusion as to Indiana law on contribution, and is no better than this Court's. Moreover, given the facts of *McClish*, it is difficult to see it as persuasive authority here.

**58**

Paragraph III in Parkview's reply brief is also denied. The cause is continued for entry of the Court's findings of fact, conclusions of law and final judgment.

It is so ordered.